# United States Court of Appeals for the Federal Circuit

---

**CODY L. ADAMS, ROSE M. ADAMSON, JOSEPH P. AGIUS, DARA W. ALLICK, JENNIFER A. ANGEL, MICHAEL T. ANGELO, SAMMY APONTE, ALICIA K. AUSTIN-ZITO, LUKE M. BADARACCO, CHAD J. BARGSTEIN, ET AL.,**
*Plaintiffs-Appellants*

**v.**

**UNITED STATES,**
*Defendant-Appellee*

---

2021-1662

---

Appeal from the United States Court of Federal Claims in No. 1:20-cv-00783-CFL, Senior Judge Charles F. Lettow.

---

Decided:  February 14, 2023

---

MOLLY A. ELKIN, McGillivary Steele Elkin LLP, Washington, DC, argued for plaintiffs-appellants.  Also represented by THEODORE REID COPLOFF, GREGORY K. McGILLIVARY.

ALBERT S. IAROSSI, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, argued for defendant-appellee.  Also represented by BRIAN M. BOYNTON, ERIC P. BRUSKIN, ERIC

LAUFGRABEN, PATRICIA M. MCCARTHY, CATHARINE PARNELL, LIRIDONA SINANI; ADAM GARRET EISENSTEIN, DOUGLAS SETH GOLDRING, Office of General Counsel, Federal Bureau of Prisons, United States Department of Justice, Washington, DC.

CRAIG BECKER, American Federation of Labor and Congress of Industrial Organizations, Washington, DC, for amicus curiae The American Federation of Labor and Congress of Industrial Organizations. Also represented by MATTHEW GINSBURG, RAVEN HALL.

ALLISON GILES, National Treasury Employees Union, Washington, DC, for amicus curiae National Treasury Employees Union. Also represented by PARAS NARESH SHAH, JULIE M. WILSON.

————————————

Before MOORE, *Chief Judge*, NEWMAN, LOURIE, DYK, PROST, REYNA, TARANTO, CHEN, HUGHES, STOLL, CUNNINGHAM, and STARK, *Circuit Judges*.

Opinion for the court filed by *Circuit Judge* CHEN, in which MOORE, *Chief Judge*, LOURIE, DYK, PROST, TARANTO, HUGHES, STOLL, CUNNINGHAM, and STARK, *Circuit Judges*, join.

Dissenting opinion filed by *Circuit Judge* REYNA, in which *Circuit Judge* NEWMAN joins.

CHEN, *Circuit Judge*.

This case involves differential payment programs established by the Office of Personnel Management (OPM), via regulations promulgated pursuant to 5 U.S.C. §§ 5545(d) and 5343(c)(4), to provide hazardous duty and environmental differential pay to federal employees. Plaintiffs-Appellants appeal from a Court of Federal Claims (Claims Court) decision dismissing their broad claims for hazardous duty and environmental differential

pay (along with related overtime, interest, and attorneys' fees and costs) based on allegations that they "work[ed] with or in close proximity to objects, surfaces, and/or individuals infected with" the novel coronavirus (COVID-19)[1] "without sufficient protective devices." *See Adams v. United States*, 152 Fed. Cl. 350, 351–52, 355 (2021). This appeal was initially argued before a panel of the court on October 6, 2021. Prior to disposition by the panel, however, we sua sponte ordered en banc review. *Adams v. United States*, 38 F.4th 1040, 1041 (Fed. Cir. 2022). Oral argument before the en banc court was held on December 9, 2022.

COVID-19 is a serious national and international health concern, and the potential ramifications of this case are far-reaching and cut across the entire federal workforce. Appellants' asserted basis for hazardous duty and environmental differential pay might encompass many federal employees in federal workplaces where ambient exposure to COVID-19 might occur.[2] *See* J.A. 29–30 ¶¶ 25, 30.

---

[1]    For clarity and consistency with the Claims Court's decision, "COVID-19" is used herein to encompass both the novel coronavirus, SARS-CoV-2, and the disease caused by that novel coronavirus, COVID-19. *See Adams*, 152 Fed. Cl. at 351 n.1.

[2]    For example, plaintiffs in the class-action suit *Braswell v. United States* seek hazardous duty pay, environmental differential pay, and overtime pay based on substantially similar allegations as raised here. *See* Second Amended Complaint ¶¶ 162–65, 176–178, *Braswell*, No. 1:20-cv-00359, (Fed. Cl. Mar. 2, 2022) ECF No. 27-1 (seeking hazardous duty and environmental differential pay for "perform[ing] work with or in close proximity to objects, surfaces, and/or individuals infected with COVID-19 without sufficient protective devices"); *see also* Appellee's En

Appellants accept that, in order for them to prevail, it is not enough that COVID-19 can readily be characterized as "unusual"—one of the requirements of the statutory provisions at issue. Rather, recognizing Congress's commitment of the necessary judgments to OPM, they agree that their case depends on whether their allegations come within OPM's existing regulations, which Appellants do not challenge and which delimit particular situations in which federal employees are entitled to hazardous duty and environmental differential payments. We conclude that OPM simply has not addressed contagious-disease transmission (e.g., human-to-human, or through human-contaminated intermediary objects or surfaces) outside two settings not present here—e.g., certain situations within laboratories and a jungle-work situation. Although OPM might well be able to provide for differential pay based on COVID-19 in various workplace settings, it has not to date adopted regulations that do so. Under existing regulations, we *affirm*.

---

Banc Br., at viii (Statement of Related Cases). *Braswell*'s original complaint included plaintiffs from the Bureau of Prisons, Department of Agriculture, and the Department of Veterans Affairs. Complaint ¶¶ 4–8, *Braswell* (Fed. Cl. Mar. 27, 2020), ECF No. 1. An amended complaint subsequently added plaintiffs from the Department of Labor, Social Security Administration, Federal Grain Inspection Service, multiple Department of Defense components, and multiple Department of Homeland Security components. Amended Complaint ¶¶ 10, 12–14, 16–24, *Braswell* (July 22, 2020), ECF No. 11. The Claims Court partially stayed *Braswell* pending the disposition of this appeal. Order at 5, *Braswell* (Fed. Cl. Aug. 20, 2021), ECF No. 25.

## BACKGROUND

### I. Statutory and Regulatory Background

At issue in this case are statutes and regulations related to (1) a hazardous duty pay program, and (2) an environmental differential pay program. In 1966, Congress authorized OPM's predecessor, the U.S. Civil Service Commission, to provide additional compensation at fixed rates (pay differentials) to salaried, General Schedule employees "for duty involving unusual physical hardship or hazard." *Adair v. United States*, 497 F.3d 1244, 1252–54 (Fed. Cir. 2007); *see also* Pub. L. No. 89-512, § 1, 80 Stat. 318, 318 (1966) (codified as amended at 5 U.S.C. § 5545(d)). At the time, there was no mechanism for compensating General Schedule employees who performed assignments involving unusual physical hardships or hazards outside those employees' job classification. *See Adair*, 497 F.3d at 1253 (citing H.R. Rep. No. 89-31, 1st Sess., at 2 (1965)). The hazardous duty pay program was thus intended to serve as a gap-filling measure to provide "additional remuneration to [an] employee asked to take unusual risks not normally associated with [their] occupation and for which added compensation is not otherwise provided[.]" *Id.* at 1254 (quoting H.R. Rep. No. 89-31 at 4).

In 1972, Congress established a Federal Wage System applicable to a different class of federal employees and authorized OPM to pay environmental differentials to those employees for "duty involving unusually severe working conditions or unusually severe hazards[.]" Pub. L. No. 92-392, § 5343(c)(4), 86 Stat. 564, 567 (1972) (codified as amended at 5 U.S.C. § 5343(c)(4)).

There is no dispute that Congress did not expressly define "duty involving unusual physical hardship or hazard," *see* 5 U.S.C. § 5545(d), nor "duty involving unusually severe working conditions or unusually severe hazards," *see id.* § 5343(c)(4). Congress instead directed OPM to establish pay differential schedules for such duties. *Id.* § 5545(d)

("The Office shall establish a schedule or schedules of pay differentials for duty involving unusual physical hardship or hazard . . . ."); *id.* § 5343(c)(4) ("The Office of Personnel Management, by regulation, shall prescribe practices and procedures for . . . administering the prevailing rate system[, and t]he regulations shall provide . . . for proper differentials, as determined by the Office, for duty involving unusually severe working conditions or unusually severe hazards . . . ."). Pursuant to congressional delegation, OPM (and its predecessor) promulgated 5 C.F.R. § 550.901 et seq., covering hazardous duty pay, and 5 C.F.R. § 532.501 et seq., covering environmental differential pay. We previously determined that OPM's regulations are reasonable in view of their authorizing statutes and the legislative histories therefor. *See Adair*, 497 F.3d at 1255, 1257. Neither party disputes this. *See* Appellants' Br. 17–21; Appellee's Br. 20–21.

OPM's regulations define "hazardous duty" as "duty performed under circumstances in which an accident could result in serious injury or death, such as duty performed on a high structure where protective facilities are not used or on an open structure where adverse conditions such as darkness, lightning, steady rain, or high wind velocity exist."[3] 5 C.F.R. § 550.902. In other words, an employee performs a hazardous duty where there is a recognized danger or risk that the employee would suffer a serious injury or death if an accident were to occur. In addition to various examples of such duties that could give rise to a serious accident provided by OPM's "hazardous duty" definition, OPM has promulgated specific schedules, pursuant to Congress's statutory mandate, that itemize several dozen

---

[3]    Appellants only allege that they are entitled to hazardous duty pay pursuant to OPM's hazardous duty pay schedule. Appellants do not seek payments for duties involving physical hardship. *See* Appellants' Br. 36–39.

inherently dangerous, specific duties approved for hazardous duty and environmental differential pay.

Specifically, "[a]n agency shall pay the hazard pay differential listed in appendix A of this subpart to an employee who is assigned to and performs any duty specified in appendix A," provided that the hazardous duty has not been accounted for in the employee's job description. *See* 5 C.F.R. § 550.904(a). Appendix A is a table titled "Schedule of Pay Differentials Authorized for Hazardous Duty Pay" that lists various duties and their corresponding pay differential. 5 C.F.R., Pt. 550, Subpt. I, Appx. A (HDP Schedule).

Similarly, OPM's environmental differential pay regulations specify that "an employee shall be paid an environmental differential when exposed to a working condition or hazard that falls within one of the categories approved by [OPM]," 5 C.F.R. § 532.511(a)(1), and as set forth in OPM's Schedule of Environmental Differentials, *see* 5 C.F.R., Pt. 532, Subpt. E, Appx. A (EDP Schedule); *see also* 5 C.F.R. § 532.511(d). Like the HDP Schedule, the EDP Schedule lists various degrees of hazards, hardships, and unusual conditions and their corresponding pay differential. *See* EDP Schedule.

The HDP Schedule was first promulgated in 1969, and certain compensable categories of the EDP Schedule were first promulgated in 1970. *See* Pay Differentials for Irregular or Intermittent Hazardous Duty, 34 Fed. Reg. 11,083, 11,083–84 (July 1, 1969) (codified at HDP Schedule); Prevailing Rate Systems, 55 Fed. Reg. 46,140, 46,180–85 (Nov. 1, 1990) (codified at EDP Schedule). The schedules have been amended over time to include additional duties that OPM approved for differential pay. For example, OPM amended the HDP Schedule in 1990 to add a Tropical Jungle Duty category that authorizes hazardous duty pay for "employees who are working in undeveloped tropical jungle regions outside the continental United States and who are exposed to . . . unusual hazards." *See* Pay Differentials,

55 Fed. Reg. 1,353, 1,353–54 (Jan. 16, 1990). OPM also amended the HDP and EDP Schedules in 1993 and 1975, respectively, to authorize differential pay for employees whose assigned duties exposed them to asbestos fibers at concentrations that could potentially cause illness or injury. *See* Pay Administration (General); Hazard Pay Differentials, 58 Fed. Reg. 32,048, 32,048–51 (June 8, 1993) (indicating that an Asbestos category will be codified in the HDP Schedule); *see also* Prevailing Rate Systems, 55 Fed. Reg. at 46,184 (referencing an Asbestos category for which environmental differential pay was available as of March 9, 1975). In total, to date, the HDP and EDP Schedules respectively identify 57 and 35 specific duties—e.g., involving hazardous materials, hazardous weather or terrain, physiological hazards, flight-related hazards, etc.—that are currently entitled to differential pay.

Relevant here, the HDP Schedule establishes a 25-percent pay differential for "work with or in close proximity to" "virulent biologicals," which are hazardous agents defined as "[m]aterials of micro-organic nature which when introduced into the body are likely to cause serious disease or fatality and for which protective devices do not afford complete protection" (Virulent Biologicals category). HDP Schedule. The EDP Schedule also establishes pay differentials for "working with or in close proximity to" "micro-organisms" (Micro-organisms category) at two different levels of risk—(1) those that pose a "high degree hazard" and "involve[] potential personal injury such as death, or temporary, partial, or complete loss of faculties or ability to work due to acute, prolonged, or chronic disease" (high risk subcategory); and (2) those that pose a "low degree hazard" (low risk subcategory). *Id*. The high risk subcategory covers "work situations wherein the use of safety devices and equipment, medical prophylactic procedures such as vaccines . . . and other safety measures do not exist or have been developed but have not practically eliminated the potential for . . . personal injury." *Id*. The EDP Schedule

ADAMS v. US                                                        9

provides two examples for understanding the scope of the high risk subcategory:

> - Direct contact with primary containers of organisms pathogenic for man such as culture flasks, culture test tubes, hypodermic syringes and similar instruments, and biopsy and autopsy material. Operating or maintaining equipment in biological experimentation or production

> - Cultivating virulent organisms on artificial media, including embryonated hen's eggs and tissue cultures where inoculation or harvesting of living organisms is involved for production of vaccines, toxides, etc., or for sources of material for research investigations such as antigenic analysis and chemical analysis

*Id.* The low risk subcategory covers "situations for which the nature of the work does not require the individual to be in direct contact with primary containers of organisms pathogenic for man. . . ." *Id.*

## II. Procedural Background

Appellants are current and former employees of the United States Federal Bureau of Prisons working at Federal Correctional Institute Danbury (FCI Danbury) in Danbury, Connecticut. FCI Danbury is a low-security federal correctional institution which houses over 650 inmates. These current and former employees are either General Schedule employees eligible for hazardous duty pay pursuant to 5 U.S.C. § 5545(d), or are employees under the Federal Wage System eligible for environmental differential pay pursuant to 5 U.S.C. § 5343(c)(4).

On June 26, 2020, Appellants initiated this action against the government, alleging that they are entitled to hazardous duty and environmental differential pay due to their "work [with] or in close proximity to objects, surfaces, and/or individuals infected with COVID-19 without

sufficient protective devices," which resulted in them being exposed to COVID-19. J.A. 30–35 ¶¶ 35–38, 45–51. There is no dispute that COVID-19 is a communicable disease that can cause injury. *See* Appellee's En Banc Br. 24; Appellants' En Banc Reply Br. 8. Appellants allege that (1) COVID-19 is easily transmissible in the workplace through "objects, surfaces, and/or individuals," (2) inmates and staff have contracted COVID-19, and (3) by reporting to the facility during the COVID-19 pandemic where they may encounter infected inmates or staff, Appellants "work with or in close proximity to" "virulent biologicals" and "micro-organisms." J.A. 27–30 ¶¶ 17, 21–24, 30. Appellants also sought deficiencies in overtime pay, under the Fair Labor Standards Act (FLSA), "caused by the failure of the agency to include hazardous duty and environmental pay differential payments" in their overtime calculations. J.A. 34–35 ¶ 57.

On February 5, 2021, the Claims Court granted the government's motion to dismiss Appellants' complaint for failure to state a claim upon which relief can be granted. *See Adams*, 152 Fed. Cl. at 351 (citing Rule 12(b)(6) of the United States Court of Federal Claims). The Claims Court determined that Appellants failed to state a claim for hazardous duty pay because neither 5 U.S.C. § 5545(d) nor OPM's implementing regulations provide hazardous duty pay for workplace exposure to objects, surfaces, and/or individuals infected with COVID-19. *Adams*, 152 Fed. Cl. at 355 (citing *Adair*, 497 F.3d at 1254, 1255). The Claims Court also determined that our prior construction of the regulatory phrase "work[] with or in close proximity to" foreclosed Appellants' claim for environmental differential pay based on alleged "work[] with or in close proximity to" "micro-organisms." *Id*. at 356–57 (citing *Adair*, 497 F.3d at 1257–58). Finally, the Claims Court determined that Appellants' FLSA claims are derivative of their hazardous

duty and environmental differential pay claims and, therefore, barred.[4] *Id.* at 357.

Appellants timely appealed, and we have jurisdiction under 28 U.S.C. § 1295(a)(3).

## STANDARD OF REVIEW

This Court reviews de novo the Claims Court's dismissal of a complaint for failure to state a claim upon which relief can be granted. *Creative Mgmt. Servs., LLC v. United States*, 989 F.3d 955, 961 (Fed. Cir. 2021). Moreover, because we review judgments, not opinions, *see Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1392 (Fed. Cir. 1987), we "may affirm the [trial] court on a ground not selected by the [trial] judge so long as the record fairly supports such an alternative disposition of the issue," *Banner v. United States*, 238 F.3d 1348, 1355 (Fed. Cir. 2001) (citation omitted).

## DISCUSSION

Neither party disputes that Congress did not define the scope and meaning of "unusual physical hardship or hazard" entitled to hazardous duty pay or "unusually severe hazards" entitled to environmental differential pay. *See* Appellants' Br. 26; Appellee's Br. 20; *see also* 5 U.S.C. §§ 5343(c)(4), 5545(d). Both parties agree that Congress delegated to OPM the authority to determine the types of duties that are entitled to such pay differentials, and neither side challenges the validity of OPM's existing regulations. *See* Appellants' Br. 16–17, 26; Appellee's Br. 5–6, 8–12. So regardless of whether Appellant's allegations could be plausibly understood as describing an "unusual physical hardship or hazard" or "unusually severe

---

[4] Appellants concede that their FLSA claims are derivative of their claims for hazardous duty and environmental differential pay. Appellants' Br. 4 n.2.

hazards," only employees who meet OPM's regulatory requirements are entitled to hazardous duty or environmental differential pay. *See* 5 U.S.C. § 5545(d) ("Under such regulations as [OPM] *may prescribe . . .* an employee . . . is entitled to be paid the appropriate differential . . . .") (emphasis added); 5 U.S.C. § 5343(c)(4) (OPM regulations "shall provide . . . for proper differentials, *as determined by the Office*, for duty involving unusually severe working conditions or unusually severe hazards") (emphasis added). Indeed, Appellants concede that their HDP and EDP claims fail if they do not fall under the HDP Schedule's Virulent Biologicals category or the EDP Schedule's Micro-organisms category. *See* En Banc Oral Arg. at 3:12–3:35. Thus, the only issue is whether Appellants' theory of recovery satisfies one of OPM's specifically delineated categories for hazardous duty or environmental differential pay.[5]

Appellants argue that they stated viable claims for environmental differential pay involving "micro-organisms" and hazardous duty pay involving "virulent biologicals" because they "were assigned to work with or in close proximity to objects, surfaces, and/or individuals (including inmates and coworkers) who were infected with COVID-19." Appellants' Br. 17–21; *see also* Appellants' Reply Br. 20–21; Appellants' En Banc Reply Br. 21 (arguing

---

[5]    Although the dissent focuses on whether Appellants adequately plead the "unusually" hazardous requirement of the HDP and EDP statutes, Dissent Op. at 3–8, Appellants do not argue that they are entitled to hazardous duty or environmental differential pay based solely on 5 U.S.C. §§ 5343(d) and 5545(d) for the reason that COVID-19 in the workplace could be understood as a "hazard" that is "unusual" or "unusually severe," nor do Appellants argue that OPM is required to promulgate regulations that cover ambient exposure to COVID-19 in the workplace. *See* En Banc Oral Arg. at 2:28–3:35.

that "it is the circumstances and surroundings that make the duties hazardous, not necessarily the duty itself"). We disagree with Appellants, based on the text, structure, and history of the Schedules, as well as on our decision in *Adair*.

As an initial matter, neither party argues that "work[] with or in close proximity to" should be interpreted differently with respect to the HDP Schedule's Virulent Biologicals category and the EDP Schedule's Micro-organisms category. Nothing in the language of HDP or EDP Schedules persuades us otherwise. Moreover, our analysis in *Adair*, where we reviewed a closely analogous provision in the EDP Schedule covering "[w]orking with or in close proximity to poisons (toxic chemicals)" is informative as to the scope of the HDP and EDP Schedule's Virulent Biologicals and Micro-organisms categories at issue here. *See* 497 F.3d at 1255–58. *Adair* involved exposure to second-hand tobacco smoke in a prison environment, which the plaintiffs alleged was a "toxic chemical" covered by the Toxic Chemicals category of OPM's HDP and EDP Schedules. 497 F.3d at 1255–58. Similar to the structure of the Micro-organisms category, the EDP Schedule describes examples of high degree toxic chemical hazards (high risk subcategory), including handling and storing toxic chemical agents, visually examining chemical agents, transferring chemical agents between containers, etc. *See* EDP Schedule. For low degree toxic chemical hazards (low risk subcategory), on the other hand, the EDP Schedule states that "the nature of the work does not require the individual to be in as direct contact with, or exposure to, the more toxic agents." *Id.* We therefore determined that "one key difference" between the high and low risk subcategories for "toxic chemicals" is that "the employee in the low [risk sub]category can be many degrees removed from the toxic agent." *Adair*, 497 F.3d at 1257.

Considering the high and low risk Toxic Chemicals subcategories together, we concluded that "[a]lthough the

examples are not exhaustive, they all describe scenarios where the job assignment requires directly or indirectly working *with* toxic chemicals or containers that hold toxic chemicals as part of a job assignment." *Id.* at 1258. We further explained that the EDP Schedule's Toxic Chemicals category is not so broad that they would "cover situations in which employees work with inmates who incidentally smoke, *for there is no work 'with'* [*second-hand smoke*] *in th*[*at*] *context.*" *See id.* (emphasis added). For these reasons, among others, we affirmed the dismissal of the complaint for failure to state a claim.

*Adair* is instructive because just as the EDP Schedule's Toxic Chemicals category requires "working with or in close proximity to" "toxic chemicals," EDP Schedule's Micro-organisms category requires "working with or in close proximity to" "micro-organisms." Like the Toxic Chemical category's examples considered in *Adair*, the examples listed in the EDP Schedule's high risk Micro-organisms subcategory require (1) "[d]irect contact with primary containers of organisms pathogenic for man . . . ," (2) "[o]perating or maintaining equipment in biological experimentation or production," or (3) "[c]ultivating virulent organisms on artificial media." EDP Schedule. These examples do not cover situations in which employees working with inmates face contagious-disease transmission via ambient exposure to COVID-19 in the workplace by way of infected humans, for "there is no work 'with' [COVID-19] in this context." *See Adair*, 497 F.3d at 1258. And we agree with the Claims Court that Appellants' alleged duties are not analogous to the class of exemplary duties provided in the high risk micro-organism subcategory of the EDP Schedule. *See Adams*, 152 Fed. Cl. at 356. Like the high risk Toxic Chemicals subcategory we analyzed in *Adair*, the high risk Micro-organisms subcategory contemplates directly working *with* micro-organisms or containers holding micro-organisms.

In addition, tracking the same high/low risk structural relationship for Toxic Chemicals, the EDP Schedule defines the low risk Micro-organisms subcategory in *direct relation* to a specific example in the high risk micro-organism subcategory—i.e., "does not require" "*direct contact with primary containers of organisms pathogenic for man,* such as culture flasks, culture test tubes, hypodermic syringes and similar instruments, and biopsy and autopsy material." *Compare* EDP Schedule at Micro-organisms – low degree hazard (emphasis added), *with id.* at Micro-organisms – high degree hazard, first example. There is thus a strong inference that the low risk Micro-organisms subcategory requires that an employee's assigned duty must at least involve working *indirectly* with the primary containers of pathogenic organisms identified in the high risk Micro-organisms subcategory. This inference is consistent with the language and overall design of the EDP Schedule, and, in particular, our conclusion in *Adair* for the similarly-defined low risk Toxic Chemicals subcategory, which likewise "does not require the [employee] to be in as direct contact with, or exposure to, the [toxic chemicals]" and which we concluded requires "indirectly working with toxic chemicals or containers that hold toxic chemicals as part of a job assignment." *See Adair*, 497 F.3d at 1257–58; *see also K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 291 (1988) ("In ascertaining the plain meaning of the statute, the court must look to the particular statutory language at issue, as well as the language and design of the statute as a whole." (citation omitted)); *Green v. Brennan*, 578 U.S. 547, 553–54 (2016) (applying statutory interpretation canons to regulations).

Although the Micro-organisms category's examples are not exhaustive, like *Adair*'s Toxic Chemicals category, they uniformly reflect the nature and locus of work contemplated in the Micro-organisms category—i.e., they require working directly or indirectly *with* "micro-organisms which involves potential personal injury such as death, or

temporary, partial, or complete loss of faculties or ability to work due to acute, prolonged, or chronic disease" as part of a job assignment. *See Adair*, 497 F.3d at 1258 (concluding that "working with or in close proximity to" "toxic chemicals" involves "directly or indirectly working *with* toxic chemicals . . . as part of a job assignment," as opposed to "situations in which known hazards . . . are common or ubiquitous in the ambient work environment"). Moreover, the substantial relationship between the EDP Schedules' Toxic Chemical category that we considered in *Adair*[6] and the Micro-organisms category here—i.e., their shared usage of the "work[] with or in close proximity to" language and specific examples focused on working directly or indirectly with the hazardous material—implicates the rule of "construction that identical words used in different parts of the same act [or provision] are intended to have the same meaning." *See Sullivan v. Stroop*, 496 U.S. 478, 484 (1990) (quoting *Sorenson v. Sec'y of Treasury*, 475 U.S. 851, 860 (1986)).[7]

Appellants' theory that "primary containers," as that term is used in the EDP Schedule, includes infected humans because humans are primary carriers for incubating and spreading COVID-19 is unconvincing. *See* Appellants' En Banc Br. 38–42; Appellants' En Banc Reply Br. 25–27; Appellee's En Banc Br. 53–57. The EDP Schedule's listed examples of "primary containers" uniformly reflect objects of research or experimentation. *See* EDP Schedule (listing

---

[6]    Appellants argue that "*Adair* is distinguishable from this case in many ways." *See* Appellants' En Banc Reply Br. 27; *see also* Appellants' En Banc Br. 19, 22, 30–31. Appellants, however, do not seek to overturn *Adair*. *See* Appellants' En Banc Reply Br. 27.

[7]    While *Sullivan* dealt with a rule of statutory interpretation, the same approach is taken to interpret regulations. *See Green*, 578 U.S. at 553–54.

culture flasks, culture test tubes, hypodermic syringes and similar instruments, and biopsy and autopsy material). Given that nothing in the regulatory history suggests such an unusual understanding of living humans as containers, we think it would be an unreasonable stretch of the term "containers" to include infected humans. Put simply, the relevant indicia in the EDP Schedule, coupled with our reasoning in *Adair* for the same "work[] with or in close proximity to" language used in the EDP Schedule's analogous Toxic Chemicals category, compels the conclusion that the EDP Schedule's Micro-organisms category requires working directly or indirectly *with* pathogenic micro-organisms *themselves*.

The HDP Schedule does not expressly recite examples illustrating when an employee "work[s] with or in close proximity to . . . [v]irulent biologicals," but historical, contemporaneous guidance from OPM provides several exemplary duties that are very similar to the above-discussed examples listed in the EDP Schedule's high risk Micro-organisms subcategory:

- Operating or maintaining equipment in biological experimentation or production.

- Cleaning and sterilization of vessels and equipment contaminated with virulent micro-organisms.

- Caring for or handling disease-contaminated experimental animals in biological experimentation and production in medical laboratories, the primary mission of which is research and development not directly associated with patient care. This includes manipulating animals infected with virulent organisms, such as inoculating of animals, obtaining blood and tissue specimens, and disposing of excreta and contaminated bedding and cages.

- Cultivating virulent organisms on artificial me-
diums, including embryonated hen's eggs and
tissue cultures where inoculation or harvesting
of living organisms is involved for production of
vaccines, toxides, etc., or for sources of material
for research investigations such as antigenic
analysis and chemical analysis.

Background Info. on Appx. A to Part 550, Fed. Per. Man-
ual, Supp. 990-2 § 550-E-4, 1973 WL 151518 (1973) (HDP
Supplement). These examples likewise do not cover situa-
tions in which employees working with inmates face conta-
gious-disease transmission via ambient exposure to
COVID-19 in the workplace, for "there is no work 'with'
[COVID-19] in this context." *See Adair*, 497 F.3d at 1258.

Although the HDP Supplement comes from a Federal
Personnel Manual that is no longer in force, we have con-
tinued to regard the Federal Personnel Manual as "a valu-
able resource for construing regulations that were
promulgated or were in effect" before it was discontinued
in 1993. *See Schmidt v. Dep't of Interior*, 153 F.3d 1348,
1353 n.4 (Fed. Cir. 1998). Because the Virulent Biologicals
category was first promulgated in 1969 and has not been
amended since then, *see* 34 Fed. Reg. at 11,083–84, the
HDP Supplement "serve[s] as an aid to agencies in deter-
mining what situations a hazardous duty described in [the
HDP Schedule] covers." *See* HDP Supplement at 1. The
HDP Supplement's examples for "work[ing] with or in close
proximity to . . . [v]irulent biologicals" uniformly reflect
"the nature of the hazard the differential is intended to
compensate"—i.e., assignments that involve directly or in-
directly working with a virulent biological *itself* rather
than ambient exposure to a virulent biological in the work-
place due to transmission by infected humans.

Additionally, it does not appear that OPM intended
that "work[] with or in close proximity to" "virulent biolog-
icals" or "micro-organisms" in the HDP and EDP

Schedules, respectively, would encompass contagious-disease transmission via ambient exposure not resulting from working directly or indirectly with the virulent biological or pathogenic micro-organism because the schedules use, for other hazardous material categories, specific language when indicating that ambient exposure to hazardous materials is entitled to differential pay. For example, the HDP Schedule uses clear language in the Tropical Jungle Duty category indicating that a possibility of exposure to infectious diseases in a jungle work environment is entitled to differential pay. *See* HDP Schedule (covering "[w]ork outdoors *in undeveloped jungle regions* outside the continental United States . . . . involv[ing] . . . [a]n unusual danger of serious injury or illness due to . . . *[k]nown exposure to serious disease* for which adequate protection cannot be provided" (emphasis added)). As such, the HDP Schedule covers ambient exposure to infectious diseases that may be inherently present in a jungle environment. In contrast, the Virulent Biologicals and Micro-organisms categories lack any corresponding description of ambient exposure in a workplace to those hazardous materials from outside sources; they instead are directed to working directly or indirectly with the hazardous material itself.[8]

In addition to Tropical Jungle Duty, OPM also added an Asbestos category to both the HDP and EDP Schedules

---

[8] We disagree with the dissent's view that government's counsel made concessions during the en banc oral argument that "nullify" our interpretation of the regulations. Dissent Op. at 9–11. The government counsel's vague, open-ended answers are a weak basis for declining to give the Virulent Biologicals and Micro-organisms categories their best interpretation within the framework of the HDP and EDP Schedules. Moreover, the government has not argued in this case for any form of deference for its reading of OPM's regulations.

to compensate federal employees who are required to work "in an area where airborne concentrations of asbestos fibers may expose them to potential illness or injury." *See* Pay Differentials, 55 Fed. Reg. 31,190, 31,190 (Aug. 1, 1990) (Proposed Rule); *see also* Prevailing Rate Systems, 55 Fed. Reg. at 46,184 (referencing an Asbestos category that was codified into the EDP Schedule on March 9, 1975). Due to concern that OPM's proposed Asbestos category for the HDP Schedule lacked a "clear definition of 'exposure'" and was "too permissive [such] that agencies would end up paying almost all . . . employees who could conceivably have been exposed to any level of asbestos," OPM incorporated a reference to the Occupational Safety and Health Administration's permissible exposure limit standard into the final Asbestos category and explained that "mere existence of airborne concentrations of asbestos fibers in a particular work environment is not enough, by itself, to warrant [hazardous duty pay]." Pay Administration (General); Hazard Pay Differentials, 58 Fed. Reg. 32,048, 32,048 (codified at HDP Schedule).

The HDP Schedule's Asbestos category thus includes express language covering "[s]ignificant risk of exposure to airborne concentrations of asbestos fibers in excess of the permissible exposure limits (PELS) in the standard for asbestos provided in title 29, Code of Federal Regulations, §§ 1910.1001 or 1926.58, when the risk of exposure is directly connected with the performance of assigned duties." HDP Schedule; *see also* EDP Schedule ("*Asbestos.* Working in an area where airborne concentrations of asbestos fibers may expose employees to potential illness or injury. This differential will be determined by applying occupational safety and health standards consistent with the permissible exposure limit promulgated by the Secretary of Labor under the Occupational Safety and Health Act of 1970 as published in title 29, Code of Federal Regulations, §§ 1910.1001 or 1926.1101."). Thus, for employees who are required to do their work in an environment with a

hazardous, airborne concentration level of asbestos fibers, OPM specifically created a category to compensate employees who bear the risk of performing assigned duties in such a hazardous environment, including employees who did not work with the asbestos material itself.  *See* HDP Schedule (Asbestos category); *see also* EDP Schedule (Asbestos category).

As evident by OPM's inclusion of language covering general, ambient exposure in the Tropical Jungle Duty and Asbestos categories, OPM knows how to distinguish categories involving ambient exposure to hazardous materials from categories involving exposure to the hazardous materials themselves resulting from work with those materials (e.g., toxic chemicals, unstable explosives, virulent biologicals, etc.).  The logical conclusion, then, is that OPM intended the Virulent Biologicals and Micro-organisms categories to apply only when the employee is working with or near a virulent biological or micro-organism itself, not doing any task that might incur exposure to a virulent biological or micro-organism generally.  If OPM intended for the HDP Schedule's "virulent biologicals" category or the EDP Schedule's "micro-organisms" category to provide differential pay for ambient exposure to dangerous, communicable diseases, it certainly "knew how to say so." *See Rubin v. Islamic Republic of Iran*, 138 S. Ct. 816, 826 (2018) (discussing congressional intent); *Green*, 578 U.S. at 553–54 (applying statutory interpretation canons to regulations). So even though the HDP Schedule's Asbestos category includes the same "work[] with or in close proximity to" language present in, e.g., the Toxic Chemicals or Virulent Biologicals categories, the additional "risk of exposure" language and concentration standard present in the Asbestos category indicates that the Asbestos category is not as limited as the other categories.  In other words, because OPM did not include any "risk of exposure" language in the Virulent Biologicals or Micro-organism categories as it did for other categories, "work[] with or in close proximity to"

"virulent biologicals" or "micro-organisms" in the context of the HDP and EDP Schedules cannot reasonably encompass duties that involve assignments unrelated to working with or near virulent biologicals or micro-organisms themselves.

That said, both Appellants and the government argue that OPM's March 7, 2020, Memorandum entitled "Questions and Answers on Human Resources Flexibilities and Authorities for Coronavirus Disease 2019 (COVID-19)" (OPM Memo) is instructive and favorable to their respective positions. *See* Appellants' Br. 39 n.9; Appellants En Banc Br. 31–32; Appellee's Br. 37 n.7; Appellee's En Banc Br. 41. We determine, however, that the OPM Memo does not take any definitive position as to whether the HDP or EDP Schedules (a) cover contagious-disease transmission via ambient exposure to virulent biologicals due to transmission by infected humans, or (b) require directly or indirectly working with virulent biologicals or micro-organisms themselves. *See* OPM Memo at 12 ("Agencies may pay a hazard pay differential . . . for exposure to 'virulent biologicals' only when the risk of exposure is directly associated with the performance of assigned duties."); *but see id.* at 12–13 (explaining that "hazard pay differential cannot be paid to an employee who may come in contact with the [COVID-19] virus or another similar virus through *incidental exposure* to the public or other employees who are ill," "employees may not receive an environmental differential for *incidental exposure* to the pandemic COVID-19," and "[t]here is no authority within the hazardous duty pay or environmental differential statutes to pay for *potential* exposure" (first and second emphases added)).

In our view, the OPM Memo does not speak with one clear, consistent voice that conflicts with the overall design of the HDP and EDP Schedules—as indicated by OPM's contemporaneously-specified duty-examples in the EDP Schedule and the Federal Personnel Manual associated with the HDP Schedule—to require work directly or indirectly with COVID-19 itself. Moreover, the OPM Memo did

not engage in any interpretive analysis of the relevant "work with or in close proximity" language, let alone even suggest that it provides a regulatory interpretation of the HDP and EDP Schedules. And because it quickly issued at the very start of a pandemic emergency, affording it deference would raise concerns about the use of informal, interpretive announcements instead of formal rulemaking to make significant regulatory changes. *See Kisor v. Wilkie*, 139 S. Ct. 2400, 2416 (2019) (explaining *Auer* deference is not warranted when a "regulatory interpretation" is "merely ad hoc statement[s]" rather than the "agency's 'authoritative' or 'official position'").

Because Appellants read "work[ing] with or in close proximity to" "virulent biologicals" or "micro-organisms" broadly to encompass contagious-disease transmission via ambient exposure and have not alleged that they worked directly or indirectly with COVID-19 itself, they have not sufficiently pled claims for hazardous duty and environmental differential pay.[9] Accordingly, the Claims Court did not err in concluding that Appellants' complaint failed to sufficiently plead claims for hazardous duty and environmental differential pay and FLSA overtime.[10]

## CONCLUSION

COVID-19 has undoubtedly presented a significant health risk to both Appellants and the general population. And we recognize that pandemics are historically rare. But the current Virulent Biologicals and Micro-organisms categories of OPM's HDP and EDP Schedules do not cover

---

[9] We requested briefing on the question of whether an amendment to the complaint should be permitted. Appellants' supplemental briefing makes no demonstration that an amendment would resolve the problems with the original complaint.

[10] *See* discussion *supra* n.4.

ambient exposure to serious, communicable diseases transmitted by infected humans. That is, the HDP and EDP Schedules do not provide payment in situations where an employee is exposed to another employee or individual carrying an infectious disease. Appellants' theory would broaden the Virulent Biologicals and Micro-organisms categories to cover a significantly large number of federal employees—far more than any other category in the HDP and EDP Schedules. Administering such a differential pay would no doubt require significant amounts of investigation and review throughout the government on a workplace-to-workplace basis to determine whether a particular risk of ambient exposure in a given location was serious enough to warrant extra pay. That is not to say that such differential pay may not be warranted; rather, OPM's schedules—as currently written—do not cover these kind of situations.

Federal employees who do not fit into one of the HDP or EDP Schedules' categories, but whose duties nonetheless expose them to particularly heightened risk associated with an infectious disease circulating within the general population, such as COVID-19, might understandably believe that they should receive additional compensation for such work during a pandemic. But that is a matter for Congress or OPM to address. For example, OPM might promulgate new HDP and EDP categories or amend existing categories to cover human-to-human exposure to serious, communicable diseases while working during a pandemic. But absent action by Congress or OPM, no judicial remedy is available. Accordingly, the Claims Court's dismissal is affirmed.

**AFFIRMED**

# United States Court of Appeals for the Federal Circuit

---

**CODY L. ADAMS, ROSE M. ADAMSON, JOSEPH P. AGIUS, DARA W. ALLICK, JENNIFER A. ANGEL, MICHAEL T. ANGELO, SAMMY APONTE, ALICIA K. AUSTIN-ZITO, LUKE M. BADARACCO, CHAD J. BARGSTEIN, ET AL.,**
*Plaintiffs-Appellants*

**v.**

**UNITED STATES,**
*Defendant-Appellee*

---

2021-1662

---

Appeal from the United States Court of Federal Claims in No. 1:20-cv-00783-CFL, Senior Judge Charles F. Lettow.

---

REYNA, *Circuit Judge*, with whom NEWMAN, *Circuit Judge*, joins, dissenting.

Appellants are one hundred and eighty-eight current or former correctional employees of the Department of Justice, Bureau of Prisons, assigned to work at the federal prison located in Danbury, Connecticut.[1] Appellants filed a complaint with the U.S. Court of Federal Claims asserting that they were entitled to additional compensation

---

[1]    *See* J.A. 23; *see also* En Banc Op. Br. at 2.

commonly known as hazardous duty pay ("HDP") and environmental differential pay ("EDP"), for work performed while exposed to COVID-19.

The government moved to dismiss the complaint under Rule 12(b)(6) of the Rules of the United States Court of Federal Claims. The Court of Federal Claims granted the motion and dismissed Appellants' complaint on grounds that it did not allege a plausible claim for relief. Appellants appealed the dismissal of their complaint.

The question before us is simple: whether Appellants' complaint states plausible claims for HDP and EDP. As shown below, the answer is "yes" for various reasons. For example, the Court of Federal Claims adopted overly narrow interpretations of the applicable statutes and regulations. In addition, the government made several admissions and concessions during the en banc argument that clarified in the affirmative the question of whether the COVID-19 pandemic gave rise to HDP and EDP. These admissions are consistent with extrinsic material referenced in the complaint that showed that COVID-19 exposure could give rise to HDP and EDP, and that at least one other department of the government was already paying COVID-19 related HDP and EDP compensation. Finally, the Court of Federal Claims departed from established law on Rule 12(b)(6) determinations by requiring actual proof of HDP and EDP eligibility—no less under its restrictive, overly narrow interpretations of the statute and regulations—instead of inquiring whether Appellants have alleged a plausible claim under the plain terms of the statutes and regulations.

Under the correct statutory and regulatory interpretations, and in view of the plain and unambiguous meaning of the words of the statutes, I believe that Appellants have pleaded sufficient facts to satisfy both key elements needed to plead HDP and EDP. I would thus reverse the Court of Federal Claims.

But there is more.  In this case, experience sheds light on the fundamental question of whether, at the time of the complaint, Appellants plausibly worked "unusually" hazardous duties involving "work with or in close proximity to" a virulent biological or microorganism.  We all have personal COVID-19 experiences.  While those personal experiences are not part of the record before the court, certain national experiences are, as are their transformative effect.

It is clear that the COVID-19 pandemic adversely affected our workplaces, schools, airlines, hotels, meat-packing houses, and hospitals.  Schools, businesses, and churches closed under government order.  We all went virtual because it was not safe to gather at weddings, funerals, and hospital bedsides.  Even courthouses were momentarily shuttered on the premise that COVID-19 was in the streets roaring like a lion.  We cannot shake off those experiences like dust from a rug.

## UNUSUALLY HAZARDOUS DUTY

The first element required to plead HDP and EDP is found in the applicable statutes.  General schedule salaried employees qualify for HDP under 5 U.S.C. § 5545(d) when they are "subjected to physical hardship or hazard not *usually* involved in carrying out the duties of [their] position." 5 U.S.C. § 5545(d) (emphasis added).  For waged employees, the Office of Personnel and Management ("OPM") is required to establish pay differentials for duties involving "*unusually* severe hazards." 5 U.S.C. § 5343(c)(4) (emphasis added).  While the HPD and EDP statutes recite the "unusualness" element differently, the parties agree that these statutes required Appellants to allege a plausible claim that their duties were unusually hazardous as compared to their typical job duties.  En Banc Op. Br. at 14–15; En Banc Resp. Br. at 24–26.

The Court of Federal Claims misinterpreted this court's opinion in *Adair* and incorrectly concluded that it was not unusually hazardous for Appellants "to work with

objects, surfaces, and/or individuals infected with" COVID-19.[2] J.A. 27. I agree with Appellants that the trial court's interpretation of the statutes was erroneous and overly narrow.

Neither the statutes nor the relevant regulations define "unusual." This means that the courts should apply its ordinary meaning. *Adair v. United States*, 497 F.3d 1244, 1253 n.2 (Fed. Cir. 2007). When the common understanding of the term "unusual" is applied, exposure to COVID-19 is clearly distinguishable from the issue in *Adair*—exposure to secondhand tobacco smoke at a facility that had long allowed inmates to smoke. *Id.* at 1252–56 (finding that secondhand smoke was not an "unusual" hazard). Because smoking by both workers and prisoners was long permitted at correctional facilities, the *typical* working environment knowingly included exposure to secondhand smoke. *Id.* Conversely, it is plausible that exposure to COVID-19 was not reasonably foreseen as a

---

[2] The majority elected not to address whether Appellants adequately plead the "unusually" hazardous element because "regardless . . . only employees who meet OPM's regulatory requirements are entitled to hazardous duty or environmental differential pay." Maj. Op. at 11–12. This shortcut is mistaken. The court was required to address this issue because it is, for purposes of this appeal, the key requirement in the HDP and EDP statutes. *See Yates v. U.S.*, 574 U.S. 528, 537 (2015) (explaining that statutory text should be interpreted by "the specific context in which [] language is used[] and the broader context of the statute as a whole"); *FTC v. Mandel Bros., Inc.*, 359 U.S. 385, 389 (1959) ("[O]ur task is to fit, if possible, all parts into a[] harmonious whole."). This omission is also significant because, as discussed below, the government's arguments directed to the regulations are unpersuasive. *See infra* note 8 (regulations should not trump statutory command).

condition of Appellants' work, unlike the "expected condition" of exposure to secondhand smoke in *Adair*. *Id*. at 1253. It is also plausible that, unlike in *Adair*, the hazards created by exposure to COVID-19 created extraordinary risks in the performance of even Appellants' most ordinary duties as federal prison employees.

In *Adair*, we also recognized that when Congress last amended the HDP statute, it was aware of the risks posed by exposure to secondhand smoke but chose not to add a separate compensable category for such exposure. *Id*. at 1254–55. Here, there is no evidence that Congress at the time of last amendment was aware of COVID-19 or of the risks associated with exposure to COVID-19.

The government asserts that COVID-19 exposure was not unusual, but "is inherent in the types of functions that [Appellants] perform" as correctional officers. En Banc Resp. Br. at 24. In the government's view, "[s]tudies abound showing that outbreaks of communicable diseases are not unusual in prisons." *Id*. at 26–27. The government further argues that Appellants' statutory construction would drastically expand the law and would cover "each new strain of the flu." *Id*. at 25–26.

In making these arguments, the government misapplies well-established pleading principles.[3] To survive a

---

[3]    The government's argument and the Court of Federal Claims' decision appear tainted by improper hindsight bias. For example, the Court of Federal Claims found that Appellants failed to "*establish* that the hazard posed by the virus is not adequately alleviated by protective or mechanical devices." *Adams v. U.S.*, 152 Fed. Cl. 350, 355 (2020) (emphasis added, citation omitted). This is an evidentiary requirement that Appellants are not required to make at the 12(b)(6) stage. Whether such equipment was available and effective such that the COVID-19 working conditions

6                                              ADAMS v. US

motion to dismiss "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *see also Cary v. United States*, 552 F.3d 1373, 1376 (Fed. Cir. 2009) (stating that RCFC 8 "does not require the plaintiff to set out in detail the facts upon which the claim is based, but enough facts to state a claim to relief that is plausible on its face"). For a complaint to be "plausible," it "does not need detailed factual allegations," but must simply contain enough detail "to raise a right of relief above the speculative level." *Twombly*, 550 U.S. at 555. Granting a motion under RCFC 12(b)(6) requires, after accepting all well-pleaded factual allegations as true, determining that the claims are facially implausible. *Lindsay v. United States*, 295 F.3d 1252, 1257 (Fed. Cir. 2002). Here, the Court of Federal Claims failed to adhere to these basic tenets of pleading and required Appellants to prove the merits of their claim for relief.

Appellants were not required to plead, as the government's argument suggests, detailed factual allegations as to how their duties were "unusually" hazardous. Nor were they, at this stage, required to prove their case. Appellants were merely required to plead enough facts to state claims

---

were rendered not unusually hazardous is a factual issue. The issue before the court is not whether the hazards of working in a prison with COVID-19 are unusual today, but whether they were unusual during the period alleged in the complaint—which runs from the early stages of the pandemic until vaccines "became readily available to" Appellants. En Banc Oral Arg. at 4:30–5:23; J.A. 29, 33. There is no doubt that Appellants have sufficiently alleged that the COVID-19 hazards during that time period were at least plausibly unusual for the purposes of a 12(b)(6) motion.

that are plausible on their face, which they have done.[4] The government, to succeed on its 12(b)(6) motion, had to establish that Appellants' claims were facially implausible, which it did not.

The courts are not heads of hardened fenceposts. The court can also draw—based on common knowledge about prisons—reasonable inferences to conclude that COVID-19 was, at least plausibly, unusually hazardous for Appellants. *See Iqbal*, 556 U.S. at 679 ("[T]he reviewing court [can] draw on its judicial experience and common sense."). It is reasonable to infer, for example, that Appellants were required to work in small, confined areas with poor ventilation.[5] To the extent more specific allegations were required, Appellants should be allowed to amend their complaint. *See* RCFC 15(a)(2) ("The court should freely

---

[4] *See* J.A. 27–33 (pleading that "Plaintiffs have performed work with or in close proximity to objects, surfaces, and/or individuals infected with the novel coronavirus;" "To date, more than 100 employees and inmates of FCI Danbury have been confirmed to be infected with COVID-19;" "COVID-19 is a virus which when introduced into the body is likely to cause serious disease or fatality;" "Exposure to objects, surfaces, and/or individuals infected with COVID-19 was not taken into account in the classification of plaintiffs' positions;" and the employees lacked "sufficient protective devices").

[5] During the period in question, were there not shutdowns, courthouse and school closures, hospitals filled to capacity, mobile morgues, and grocery washing? Indeed, when this case was argued before the panel, counsel argued from behind plexiglass dividers, masks and social distancing were required, the number of counsel appearing for each side was limited, and the entire courthouse building was closed to the public, all for the express purpose of avoiding COVID-19 exposure.

give leave when justice so requires."). In cases involving HDP and EDP, the court should be loath to close its doors too quickly.

In sum, Appellants have adequately pleaded facts describing duties involving "unusual" hazards, satisfying the statutory requirement of 5 U.S.C. §§ 5545(d) and 5343(c)(4).

WORK WITH OR IN CLOSE PROXIMITY TO

The second element required to plead HDP and EDP is found in the regulations. The parties agree that Appellants were required to plead that they worked "with or in close proximity to" a "virulent biological" (for HDP) or a "microorganism" (for EDP). En Banc Op. Br. at 34–35; En Banc Resp. Br. at 45–46. I believe that Appellants have adequately pleaded this element.

In its briefs, the government argues that the "work with or in close proximity to" element includes only "biological production and experimentation with pathogenic micro-organism[s]." Panel Resp. Br. at 31–32; *see also id.* at 23 (arguing that the "employee's duties [must] involve directly or indirectly working with pathogenic micro-organisms *themselves*, or containers that hold pathogenic micro-organisms themselves, as part of a job assignment"). The government's position on this point limits the regulations' scope to cover only employees who work in a laboratory or perform substantially similar duties. *See* En Banc Resp. Br. at 45–46 (arguing that the "focus of the work [must be on] the biological material itself"). Under this theory, scuffling with an inmate who is infected with COVID-19 would not plausibly allege "work with or in close proximity to" the COVID-19 virus. To qualify, the correctional officer would have to scuffle with a container of COVID-19, and the scuffle would have to take place in a lab.

At the en banc oral argument, however, the government unambiguously abandoned this position. The

ADAMS v. US                                                    9

government conceded that healthcare workers treating
COVID-19 patients could qualify for HDP and EDP. En
Banc Oral Arg. at 44:30–47:25 (discussing potentially eli-
gible doctors), 50:20–51:15 (conceding that a nurse working
in a radiology unit transferred to work in a COVID-19 unit
"would be eligible"). Counsel for the government ex-
plained:

> I think it ultimately depends on both the job de-
> scription and exactly the tasks that are involved. .
> . . I think that depending on the situation [a fed-
> eral employee working with a patient sick with
> COVID-19] may be entitled to [HDP or EDP].

*Id.* at 1:00:25–1:01:10; *see also id.* at 1:01:10–1:03:31.

In light of these concessions, the court asked several
related questions, including the following:

> Q. [I]s there a situation which human-to-human
> contact could lead to exposure to a biologic that
> would entitle [Appellants] to hazardous duty pay?
>
> A. There may be a narrow set of circumstances. . . .

*Id.* at 47:47–48:25.

> Q. Is your position that human-to-human contact
> that's required as part of the job can lead to expo-
> sure to biologics and to compensation?
>
> A. . . . Is there any situation in which being near
> another individual could give rise [to enhanced
> pay]? Potentially.

*Id.* at 57:12–58:00.

To sum up the government's position, I asked the gov-
ernment whether "there are circumstances wherein a cor-
rectional officer can be entitled to hazardous pay," and the

government responded "yes."[6]  *Id*. at 56:05–21.  This statement by the government, in my view, belies the argument that Appellants have not alleged plausible claims.

The majority dismisses out of hand the government's stated position at oral argument.  The majority asserts that the government's answers at oral argument were "vague" and "open ended."  Maj. Op. at 19 n.8.  But the "yes" or "no" question whether "there are circumstances wherein a correctional officer can be entitled to hazardous pay" was neither vague nor open ended.  En Banc Oral Arg. at 56:05–21.  Nor was the answer "yes" vague or open ended.  *Id*.  There is no lack of clarity in either.

Second, the majority determines that the government's statements are "a weak basis for declining to give the Virulent Biologicals and Micro-organisms categories their best interpretation."  Maj. Op. at 19 n.8.  But statements made by counsel before the en banc court are not a "weak basis" for resolving the issue at hand.  This court often accepts such statements as "concessions" or "admissions" and relies on them in reaching and writing its determinations.  *See Taylor Energy Co. LLC v. United States*, 975 F.3d 1303,

---

[6]    The government did not explain at the en banc oral argument why it changed its position.  But one member of the en banc court remarked, "I know you are trying to not foreclose a reading that would give benefits to people in the future if they come up with a better argument," and the government did not dispute it.  En Banc Oral Arg. 1:02:58–1:03:45.  This effort to buoy the government's position cements Appellants' point that they have stated plausible claims for relief.  It recognizes that the majority's focus has been on whether Appellants *proved* entitlement and not whether they stated plausible claims for relief.  In addition, by not holding the government's feet to its concessions, the majority unwisely takes this policy decision out of the government's hands.

1312 n.8 (Fed. Cir. 2020) (declining to consider a "compelling," potentially "dispositive" argument because the government conceded it during oral argument); *see also Checo v. Shinseki*, 748 F.3d 1373, 1378 n.5 (Fed. Cir. 2014) (questioning a tribunal's "reluctance to accept [the government's] concession" in view of the general rule that admissions are binding (collecting cases)). The majority advances no persuasive reason why in this appeal we should treat the government's responses to the court's questions as weak.

Third, the majority argues that the government's statements before the en banc court should be ignored because "the government has not argued in this case for any form of deference for its reading of OPM's regulations." Maj. Op. at 19 n.8. This argument misapprehends what is required at a Rule 12(b)(6) stage. Appellants need not prove that the government believes in and stands by its own statements made before the court.

The en banc statements undermine the majority's holding which limits this element to employees that are "working directly or indirectly with" a virulent biological or microorganism. *See* Maj. Op. at 18–19 (stating that the regulations do not "encompass contagious-disease transmission via ambient exposure not resulting from working directly or indirectly with the virulent biological or pathogenic micro-organism"); *id.* at 4 (explaining that the regulations limit enhanced pay to "certain situations within laboratories"). Appellants' complaint alleging COVID-19 exposure, analogous to that of a healthcare worker, adequately pleads this element. *See* J.A. 27–33.

In addition, there exists principled substantive reasons why COVID-19 exposure falls within the scope of the regulations and why the regulations are not limited to the narrower construction of "working directly or indirectly with the virulent biological or pathogenic micro-organism." Maj. Op. at 18–19.

First, the government's narrower "work directly or in-directly" interpretation is at odds with the common meaning of the regulatory language "work with or in close proximity to." *See, e.g.*, Proximity, *Black's Law Dictionary* (11th ed. 2019) ("The quality, state, or condition of *being near* in time, place, order, or relation." (emphasis added)). If the OPM intended to limit the phrase to mean only laboratory experimentation, it could have done so. But it chose instead to use a phrase that unambiguously encompasses COVID-19 exposure. *See Conn. Nat. Bank v. Germain*, 503 U.S. 249, 253–54 (1992) ("A court should always turn first to one, cardinal canon before all others . . . [w]hen the words of a statute are unambiguous, then, this first canon is also the last[.]"); *see also Wis. Cent. Ltd. v. U.S.*, 138 S. Ct. 2067, 2074 (2018) ("[W]ords generally should be interpreted as taking their ordinary, contemporary, [and] common meaning. . . ." (citation omitted)).

Limiting the regulations to the narrower construction of "working directly or indirectly" with COVID-19 also renders the phrase "in close proximity to" in the regulations superfluous. *Corley v. United States*, 556 U.S. 303, 314 (2009) ("[A] statute should be construed [to give effect] to all its provisions, so that no part will be inoperative or superfluous, void or insignificant." (citation omitted)). Working "directly" or "indirectly" with something is still "working with" it. "In close proximity to" provides the regulations with expanded, not limited, scope.

The government contends that because the section involving "Tropical Jungle Duty" of the HDP Schedule includes known exposure to disease, the other sections of the schedule necessarily exclude such exposure. Panel Resp. Br. at 33–35; *see also* Maj. Op. at 18–21 (discussing the Tropical Jungle Duty and Asbestos categories). This *expressio unius* argument is unpersuasive because the phrase "work with or in close proximity to" includes within its plain meaning "exposure to serious disease." *See* 5 C.F.R., Pt. 550, Subpt. I, App. A (HDP Schedule) ("work

ADAMS v. US                                                                            13

with or in close proximity to . . . Virulent biologicals . . . which when introduced into the body are *likely to cause serious disease or fatality*" (emphasis added)).  As a result, I would not read out exposure from the broader phrase just because other sections of the HDP schedule cover narrower circumstances. *Orlando Food Corp. v. U.S.*, 423 F.3d 1318, 1325 (Fed. Cir. 2005) ("[T]he maxim e*xpressio unius est exclusio alterius* is not useful when its application would produce a result that is inconsistent with the plain language of the statute.").  It seems just as logical that the Tropical Jungle Duty category, which falls within the same schedule as the at-issue "virulent biologicals" category, supports an expansive reading because it shows that the OPM was aware of the risks associated with exposure to hazards and intended the regulations to encompass them.[7] *See Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 381 (2013) (The canon "can be overcome by contrary indications that adopting a particular rule or statute was probably not meant to signal any exclusion." (citation omitted)).

Second, the narrower interpretation effectively eliminates the virulent biologicals and microorganisms categories because, as discussed above, the duty must also be unusual compared to the employee's typical job duties. During oral argument before the panel, when pressed to explain what circumstances would permit HDP under the government's proposed interpretation, the only example the government could provide was if someone untrained to

---

[7]    The government also relied on examples of what qualifies for EDP in the regulation to argue that the "microorganism" category should be limited to those examples. Panel Resp. Br. at 29–31; *see also* Maj. Op. at 14–16 (applying a limiting interpretation because of the EDP examples).    There is no compelling reason to narrow a regulation's expansive scope because of non-limiting examples.

work with viruses was required to harvest virulent tissue culture. Oral Arg. at 31:00–31:30. But the regulations do not require a "training" or other similar limitations. This explanation exposes the weakness of the narrower reading, and may have been a reason why the government conceded this position before the en banc court.[8] *See Lau Ow Bew v. United States*, 144 U.S. 47, 59 (1892) ("Nothing is better settled than that statutes should receive a sensible construction, such as will effectuate the legislative intention, and, if possible, so as to avoid an unjust or an absurd conclusion."); *Green v. Brennan*, 578 U.S. 547, 553–54 (2016) (applying canons of statutory interpretation to regulations).

Third, *Adair* does not compel the narrower interpretation. *Contra* Maj. Op. at 14–16. *Adair* considered a completely different factual situation—whether employees working around "inmates who incidentally smoke" constituted "[w]orking with or in close proximity to *poisons (toxic chemicals)*." *Adair*, 497 F.3d at 1257–58 (emphasis added). Appellants' allegations here are substantially more aligned with the regulatory language and more plausible. *See id.* at 1258 (explaining that secondhand smoke was a "known

---

[8]   The narrower interpretation also raises serious questions as to the regulations' validity. *Corley*, 556 U.S. at 314; *Belkin Int'l, Inc. v. Kappos*, 696 F.3d 1379, 1384 (Fed. Cir. 2012) ("[R]egulations cannot be interpreted to trump [] statutory command. . . ."). Nothing in the statutes suggests that enhanced pay may be limited to employees who work "directly or indirectly" with a virus or microorganism in a laboratory. *See* 5 U.S.C. §§ 5545(d), 5343(c)(4) (requiring merely that the hazard be unusual); *see also* En Banc Oral Arg. at 47:47–48:25, 57:12–1:03:31 (the government conceding that human-to-human contact could satisfy the "work with or in close proximity to" element). *See supra* note 2.

hazard" that had long been "ubiquitous in the ambient work environment").

Fourth, extrinsic materials support including COVID-19 exposure in the regulatory requirement. *Contra* Maj. Op. at 17–18, 22–23. On March 7, 2020, OPM published a memorandum (the "OPM Memo"), which explains that federal employees may recover EDP or HDP for COVID-19 exposure.[9] *U.S. Office of Personnel Management Questions and Answers on Human Resources Flexibilities and Authorities for Coronavirus Disease 2019 (COVID-19)*, OPM Memorandum No. 2020-05, Attach. A at 11–13 (Mar. 7, 2020).[10] The OPM Memo provides that COVID-19 exposure falls within the HDP "virulent biologicals" category when the employee is "exposed to the virus during the performance of assigned duties (e.g., as in the

---

[9] For its part, the government relied on a non-operative Federal Personnel Manual, which provided examples of what qualified for HDP. En Banc Resp. Br. at 8–9 (citing Fed. Personnel Manual, Supp. 990-2 § 550-E-4); *see also* Maj. Op. at 17–18. Setting aside the expansive regulatory language, I do not believe non-limiting examples from a manual that was retired in 1993 are more persuasive than the 2020 OPM Memo that addresses the precise issue in this case.

[10] During en banc argument I incorrectly stated that the OPM Memo was attached to Appellants' complaint. In fact, the Appellants reference the OPM Memo in the complaint. *See* J.A. 27 (¶ 18); *Celgene Corp. v. Mylan Pharms. Inc.*, 17 F.4th 1111, 1128 (Fed. Cir. 2021) ("[A] document integral to or explicitly relied upon in the complaint may be considered without converting the motion to dismiss into one for summary judgment." (citation omitted)); Maj. Op. at 22 (noting that "both Appellants and the government argue that [the OPM Memo] is instructive and favorable to their respective positions").

case of a poultry handler or health care worker)" but not when the employee is incidentally exposed "to the public or other employees who are ill." *Id.* at 11–12. "Poultry handlers" and "health care workers" are obviously not laboratory employees working directly or indirectly with COVID-19. These employees' jobs, like the poultry handlers, require them to work closely with or around other people, subjecting the employees to the hazard of COVID-19 exposure while on the job. The OPM Memo also counsels that EDP may be granted in similar situations. *Id.* at 11–13.

Consistent with the OPM Memo, the government recognizes that agencies have awarded HDP and EDP for COVID-19 exposure or published internal guidance explaining that their employees may be entitled to enhanced pay for COVID-19 exposure. For instance, the government acknowledged that the Indian Health Service, an agency within Department of Health & Human Services, awarded enhanced pay for COVID-19 exposure. *See* En Banc Oral Arg. at 43:23–44:04; *see also Brief for AFL-CIO as Amicus Curiae Supporting Appellants*, 2022 WL 4354602 at \*20–21. The U.S. Department of the Interior likewise published guidance explaining that its employees may be entitled HDP or EDP. *Memorandum from Raymond A. Limon, Deputy Assistant Secretary-Human Capital and Diversity Chief Human Capital Officer, to Human Capital Officers* (April 21, 2020); *U.S. Dep't of the Interior Human Resources Flexibilities Guide for Employees, Emergency Response Reference for Coronavirus Disease 2019 (COVID-19)* at 10 (Mar. 3, 2020). On this point, we should recognize both what the government does and what it says.

In the majority's view, "the OPM Memo does not speak with one clear, consistent voice" or provide "any interpretive analysis." Maj. Op. at 22–23. But it cites no legal authority for such a rigid test. As discussed above, the OPM Memo—based on its text and how other agencies have understood it—is a persuasive extrinsic material for the interpretation issues in this case.

The majority also states that it does not need to afford the OPM Memo "deference" because the OPM Memo did not go through "formal rulemaking." *Id.* at 23. But the parties do not argue deference. *See, e.g.,* En Banc Op. Br. at 31–32; En Banc Resp. Br. at 40–41, 49. The OPM Memo illustrates, in the government's own words, what the government practice was during the time period in question. It shows that HDP and EDP were available on a case-by-case basis for COVID-19 related risks. It evidences OPM's understanding of its regulations' scope and is therefore indicative of whether the regulations cover COVID-19 exposure.[11]

Thus, the regulatory language encompasses COVID-19 exposure, and Appellants plausibly alleged that they were assigned duties that required them to "work with or in close proximity to" a virulent biological or microorganism.

---

[11] The majority states that "Appellants' theory would broaden the Virulent Biologicals and Micro-organisms categories to cover . . . far more [employees] than any other category in the HDP and EDP Schedules. Administering such a differential pay would no doubt require significant amounts of investigation and review throughout the government on a workplace-to-workplace basis." Maj. Op. at 24. This court should not justify decisions based on policy considerations that more appropriately belong in the hallways and hearing rooms of Congress, or within agency policy-setting directorates. In any event, the majority's policy considerations are belied by the record before this court given that agencies have published instructive guidance that addresses and unites HPD, EDP, and COVID-19 exposure.

CONCLUSION

Appellants have stated plausible claims on which relief may be granted.  Questions of fact remain to determine ultimately whether, and which, Appellants are entitled to any, and what amount of HDP, EDP, and the derivative claims.  For these reasons, I respectfully dissent.